IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| VICTORIA SUE MAXIMOVICH, | ) | Case No. 1:24-cv-01448 |
| | ) | |
| Plaintiff, | ) | JUDGE CHARLES E. FLEMING |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.     Introduction

Plaintiff, Victoria Sue Maximovich ("Maximovich"), seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Maximovich's application for DIB be affirmed.

## II.     Procedural History

Maximovich filed for DIB on July 1, 2022, alleging a disability onset date of August 22, 2019.[1] (Tr. 165). The claims were denied initially and on reconsideration. (Tr. 82, 93). She then

---

[1] The ALJ decision and the state agency reviewers note that Maximovich filed for DIB on June 30, 2022 (Tr. 18, 70), however the application demonstrates she filed on July 1, 2022. (Tr. 165).

requested a hearing before an Administrative Law Judge. (Tr. 102). Maximovich, represented by

counsel, and a vocational expert ("VE") testified before the ALJ on July 5, 2023. (Tr. 31). On

August 30, 2023, the ALJ issued a written decision finding Maximovich not disabled. (Tr. 18-

27). The Appeals Council denied her request for review on June 26, 2024, making the hearing

decision the final decision of the Commissioner. (Tr. 1-3; see 20 C.F.R. §§ 404.955, 404.981).

Maximovich timely filed this action on August 24, 2024. (ECF Doc. 1).

## III.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Maximovich  was 50 years old on the date last insured, making her an individual closely

approaching advanced age according to Agency regulations. (*See* Tr. 25). She graduated from

high school. (*See id.*). In the past, she worked as a service clerk, DOT 249.362-026, SVP 4 semi-

skilled, sedentary performed at light, and manager trainee, DOT 189.167-018, SVP 6 skilled,

light performed at heavy. (Tr. 53-54).

### B.    Relevant Medical Evidence[2]

On February 8, 2019, Maximovich presented to the emergency department ("ED") for a

urinary tract infection. (Tr. 307). Upon examination, she had generalized mid and low back

tenderness. (Tr. 313). Maximovich's active problems were listed as depression with anxiety,

extreme obesity, knee MCL sprain, obesity, and smoking. (Tr. 311).

---

[2] Although Maximovich provides a summary of medical evidence relating to her mental health
impairments (*see* ECF Doc. 9, p. 5), she does not raise error with the ALJ's evaluation of these
impairments. Instead, she raises error solely with the ALJ's evaluation of physical limitations.
(*Id.* at pp. 6-24). I therefore limit my review of the medical evidence only to these issues and
deem any argument as to her mental health impairments waived. *See McPherson v. Kelsey*, 125
F.3d 989 (6th Cir. 1997).

Maximovich saw Amanda Springer PA-C for a six month follow up appointment complaining of "I" shaped pain across her shoulders and lower back. (Tr. 266-67). She rated the pain 7/10 and described it as constant and throbbing. (Tr. 266). In a "Prescription Drug Use Questionnaire," Maximovich responded "no" to the following questions: Do you have more than one painful condition; and are you disabled by pain (unable to work or participate fully in activities). (Tr. 266-67). Further, she responded "yes" to the following questions: have you tried any non-medication treatments for your pain problem (such as physical therapy, TENS, biofeedback); has your pain been adequately treated over the past 6 months. (Tr. 266). P.A. Springer noted the Maximovich had a history of chronic pain and fibromyalgia. (Tr. 267). Maximovich had prescriptions for gabapentin and baclofen which helped control the pain and were well tolerated. (*Id.*). She had also received injections, but Maximovich did not feel it was time for an injection at this appointment. (*Id.*). She reported feeling "comfortable" and "doing well." (Tr. 269). Upon examination, her musculoskeletal system was unremarkable, and she had normal strength and range of motion but had pain with compression of the left sacroiliac joint. (*Id.*). Her BMI was 40.49. (*Id.*).

Maximovich presented for a fibromyalgia follow up appointment with Zachary Zumbar, M.D. on October 27, 2020. (Tr. 271). She endorsed ongoing pain from her shoulder blades down her spine to her hips. (*Id.*). She had more discomfort in her lower sacral spine and left hip during this encounter with the discomfort aggravated with activity. (*Id.*). The pain was rated an 8/10. (*Id.*). Since her last appointment, her symptoms were persistent but stable and her prescriptions were helpful. (*Id.*). Her pain increased with walking and was alleviated when she sat down. (*Id.*). Maximovich declined an injection. (*Id.*). Upon examination, her gait was mostly normal with 5/5

3

strength, she had bilateral lumbar and sacroiliac tenderness, and was positive for Patrick's sign bilaterally. (Tr. 274).

On December 17, 2021, Maximovich presented for a bilateral sacroiliac joint injection with Dr. Zumbar. (Tr. 365). Her BMI was 43.58. (*Id.*).

Maximovich presented to the ED on January 24, 2022, with a chief complaint of right-side ankle pain. (Tr. 383). Her pain was an 8/10. (*Id.*). Her surgical history notes a bilateral Scapulothoracic bursa injection on February 4, 2019. (Tr. 385). She returned the following day after an ultrasound revealed deep vein thrombosis in her lower extremities. (Tr. 390). Maximovich denied back pain but endorsed right knee and ankle pain for the last two days. (*Id.*). Upon examination, she had normal range of motion of her back. (Tr. 391). She was prescribed Xarelto and instructed to follow up with a primary care doctor for continued treatment. (Tr. 392).

Maximovich treated with Rabia Toor, M.D. for her blood clots in her right leg from February 1, 2022, through May 18, 2022.[3] (Tr. 394, 400, 410). Maximovich reported on February 1, 2022, that she had aching pain in her right leg but was able to walk without difficulty. (Tr. 394). Her swelling had significantly improved at her February 28, 2022 encounter, however she continued having 8/10 aching pain behind her right knee. (Tr. 400). Dr. Toor continued Maximovich on Xarelto indefinitely to manage her blood clots. (Tr. 410). Dr. Toor's notes indicate that Maximovich was positive for chronic back pain. (Tr. 395, 401, 411). Maximovich was positive for gait problems on February 28, 2022 (Tr. 401) but negative on May 18, 2022. (Tr. 411). Her BMI ranged from 44.48 to 47.78 throughout her encounters with Dr. Toor. (Tr. 412, 425).

---

[3] I note that the record also contains treatment notes from Dr. Toor for hearing loss issues and anxiety and depression. (Tr. 416, 422). However, as noted above, Maximovich does not raise error regarding the ALJ's consideration of these impairments.

4

Maximovich presented for a follow up appointment with Dr. Zumbar on May 31, 2022. (Tr. 253). She reported that she had no relief from her December 17, 2021 injection and her pain and symptoms had been persistent and stable. (*Id.*). She rated her pain a 4/10. (*Id.*). She was able to stand for 15 minutes before needing to sit down. (*Id.*). Upon examination, Dr. Zumbar noted bilateral and lumbar sacroiliac tenderness, however she had 5/5 musculoskeletal strength. (Tr. 256).

### C.  Unexhibited Medical Evidence[4]

A November 4, 2013 x-ray of her thoracic spine revealed mild disc space narrowing and osteophyte formation at T8-9. (Tr. 63). The impression from this x-ray was mild degenerative changes of the thoracic spine without acute abnormality. (*Id.*).

Dr. Zumbar ordered an x-ray of Maximovich's lumbar spine on May 7, 2014, after she complained of low back pain. (Tr. 62). This x-ray revealed intact and appropriately aligned lumbar segments, six lumbar-type segments below the last set of paired ribs, marked degenerative interspace narrowing at L3-L4 interspace with endplate eburnation, vacuum disc phenomena and some marginal spondylosis, as well as degenerative changes involving the intervertebral disc space at L4-L5. (*Id.*). The impressions were: six lumbar-type segments with similar normal arrangement, degenerative narrowing, advanced degenerative disc disease, endplate eburnation and spondylosis at L3-L4, and a less prominent degree of degenerative disc and endplate changes at L4-L5. (*Id.*). An MRI showed severe degenerative disc disease at L2-L3 disc level with marked narrowing of the disc, endplate changes of degenerative disc disease,

---

[4] The record contains unexhibited medical records that pre-date Maximovich's alleged onset date. Because she raises error related to these records they are summarized in this section.

bulging of the L2-L3 disc indenting the ventral aspect of the thecal sac, as well as bulging into the left L2-L3 intervertebral neural foramen. (Tr. 64).

A May 19, 2014 x-ray of Maximovich's left hip revealed minimal femoral head spurring related to minimal/early osteoarthritis, preserved alignment, with no acute fracture. (Tr. 66).

A December 13, 2015 x-ray of Maximovich's left knee revealed preserved bony alignment, mild marginal spurring at the medial tibiofemoral compartment, with no acute fracture. (Tr. 61). The impression was minor osteoarthritis at the medial tibiofemoral compartment. (*Id.*).

### D.     Medical Opinion Evidence

State agency medical reviewer, Gary Hinzman, M.D. determined that there was insufficient evidence to evaluate Maximovich's conditions on August 26, 2022. (Tr. 71). Dana Schultz, M.D. affirmed this determination on November 16, 2022. (Tr. 78).

### E.     Administrative Hearing Evidence

At the July 5, 2023 hearing, Maximovich testified that she would answer questions, to the best of her ability, for her condition during the relevant time period of 2020. (Tr. 38). At that time, Maximovich was 5′10″ and weighed 290 pounds. (*Id.*). She lived in a house with her husband and minor granddaughter. (Tr. 39). Maximovich has custody of her 10-year-old granddaughter and often cares for her 11-year-old grandson with autism while his mother is at work. (Tr. 39-40). Her home has two stories; however, she had not been able to go up the stairs into the second story for approximately five years. (*Id.*). Maximovich's primary issue with climbing stairs is pain, but she also stated that if she pushes herself too hard it becomes a balance problem because her knees will give out. (*Id.*).

She is right-handed. (Tr. 38). She completed the 12th grade. (Tr. 40). Maximovich has a driver's license and has no difficulty driving on "short" trips. (Tr. 40). She was unable to define what a short trip meant but stated that she had not driven out of Ashland County in the last year with the exception of going to her attorney's office. (*Id.*).

Maximovich last worked in December 2015 as a customer service representative for a printing and distribution department. (Tr. 40-41). In that role she received payments from customers, met with clients to review projects, and provided shipping quotes. (Tr. 41). This job required her to sit more than stand to perform those tasks. (Tr. 41-42). It also required her to carry 15-20 pounds. (Tr. 42). Maximovich was terminated from this job after not providing a doctor's note when she tore her meniscus. (*Id.*). She had worked there for eight years. (*Id.*).

Prior to that job, Maximovich worked full time as an assistant manager at a clothing store from 2005-2008. (Tr. 42-43). In this role, Maximovich oversaw scheduling, hiring and firing staff, and was required to carry 75 pounds. (Tr. 43).

Asked about her typical day, Maximovich stated that the first thing she did after waking up was make a pot of coffee. (Tr. 44). She drank two cups of coffee while "mess[ing] around" on her phone or tablet before soaking the dishes. (*Id.*). As the dishes were soaking for about an hour, Maximovich sat on the couch. (*Id.*). After doing the dishes – with intermittent breaks – she ate lunch and then began preparing dinner until her grandchildren got home around 3:00 p.m. (Tr. 44-45). She would then instruct them to do their homework before having dinner. (Tr. 45). After dinner, she watched tv before going to bed. (*Id.*).

Maximovich kept a barstool in the kitchen so that she had a seat available should she need it because she could not stand longer than 15 to 20 minutes at a time. (Tr. 46). However, she could not sit in the same position for longer than 15 minutes at a time either. (*Id.*).  She stated

that despite her impairments, she was able to complete all her personal care tasks independently. (Tr. 45). Her family used a grocery pickup service so that she did not need to go grocery shopping in store; but if there was something she was unable to get via that service, a family member would go to the store to pick it up. (Tr. 46).

Regarding her back pain, Maximovich stated that despite several injections, the pain was never relieved. (Tr. 47). At best, one of the nerve block injections was "partially successful" meaning that it did not have the desired effect of serious pain relief for six to twelve months, but she experienced some relief for a couple of weeks. (*Id.*). Because they were unsuccessful, Maximovich stopped getting them. (*Id.*). She recalled the pain would come and go but was present for nine hours in a ten-hour timeframe. (Tr. 48). She believed her low back pain may have caused her to lose the feeling in the two small toes on each of her feet. (*Id.*).

She also experienced pain flare ups in her knees and shoulders, as well as constant pain in her left hip. (*Id.*). At the time of the hearing, she had recently changed her muscle relaxers which helped a little bit. (Tr. 49). She denied having any issues with focus or concentration. (Tr. 50).

Regarding treatment, Maximovich stated that she has seen Dr. Toor since 2020 for blood clots, anxiety, and iron and vitamin D deficiency. (Tr. 50-51). She began treating with Dr. Toor following an emergency room visit in January 2020. (Tr. 50). She had presented to the emergency room with a suspected blood clot after her right leg swelled to three times its normal size. (*Id.*). As a result of the blood clots, Maximovich takes blood thinners, is instructed to keep her leg elevated, and gets ultrasounds every year. (Tr. 51).

Maximovich stated that she did not return to work because she could not sit still. (Tr. 52). Sitting, standing, or walking for longer than 15 to 20 minutes caused her back to seize up and if she could not reposition herself, she experiences "Jello leg" where she has no control over her

8

legs. (*Id.*). On one occasion, she "face-planted" into an entertainment center because she was unable to sit down fast enough. (Tr. 52-53). Sitting did not always alleviate her back pain, sometimes she needed to lay down on a heated massage pad. (Tr. 53).

Next the VE testified. The VE classified Maximovich's past work as service clerk, DOT 249.362-026, SVP 4 semi-skilled, sedentary performed at light, and manager trainee, DOT 189.167-018, SVP 6 skilled, light performed at heavy. (Tr. 53-54). According to the VE, a hypothetical individual with the same age, education, and work experience as Maximovich who could perform light work; occasionally climb ramps and stairs, occasionally stoop, kneel, and crouch; but cannot crawl or climb ladders, ropes, or scaffolds; have no exposure to unprotected heights or moving mechanical parts; and could not perform commercial driving could perform Maximovich's past work as a service clerk as classified and as performed and as the manager trainee as classified but not as performed. (Tr. 55).

Additionally, at the unskilled level, this hypothetical individual could also perform the jobs of cashier, SVP 2, light exertion, DOT 211.462-010 with 533,000 jobs in the national economy; sales attendant, SVP 2, light exertion, DOT 299.677-010, with 252,000 jobs in the national economy; and housekeeper, SVP 2, light exertion, DOT 323.687-014, with 175,000 jobs in the national economy. (Tr. 55-56).

According to the VE, Maximovich acquired transferable job skills from her work as a customer service clerk including informing customers of prices and shipping dates, editing orders, data entry, recording transactions, and clerical tasks. (Tr. 56). These skills are transferable to the sedentary occupational base. (*Id.*).

If the first hypothetical individual was limited to simple, routine, and repetitive tasks that person could not perform Maximovich's past work or perform her transferable skills. (Tr. 57).

Upon further questioning the VE opined that an individual limited to sitting, standing, and walking for a total of six hours per workday would be precluded from working. (Tr. 56). Further, if a hypothetical individual could not hold a position – i.e. sitting, standing, or walking – for longer than 15-minute increments, that person could not perform sedentary work, but could perform some light jobs. (Tr. 58). If a hypothetical individual needed to elevate their leg to waist level when sitting, that limitation would be work preclusive. (Tr. 58-59). Further, a person can be off task no more than ten percent of the time to maintain employment and can incur no more than one absence per month. (Tr. 57).

## IV.    The ALJ's Decision

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2020.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of August 22, 2019, through her date last insured of December 31, 2020 (20 CFR 404.1571 et seq.).

3.    Through the date last insured, the claimant had the following severe impairments: fibromyalgia; lumbar degenerative disc disease; obesity (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can occasionally climb ramps and stairs. She can perform occasional stooping, kneeling, and crouching, and cannot crawl or climb ladders, ropes, or scaffolds. Additionally, the claimant can have no exposure to unprotected heights or moving mechanical parts. She is also unable to perform commercial driving.

6.    Through the date last insured, the claimant was capable of performing past relevant work as a customer order clerk and assistant manager. This work

did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.     The claimant was not under a disability, as defined in the Social Security Act, at any time from August 22, 2019, the alleged onset date, through December 31, 2020, the date last insured (20 CFR 404.1520(f)).

(Tr. 21-26).

## V.     Law & Analysis

### A.     Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.     whether the claimant is engaged in substantial gainful activity;

2.     if not, whether the claimant has a severe impairment or combination of impairments;

3.     if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.     if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.     if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.     Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial

evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the

court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 749 (6th Cir. 2007).

## VI. Discussion

Maximovich raises the following issue for this Court's review: "The ALJ failed to identify substantial evidence supporting the residual functional capacity finding and failed to evaluate the medical opinions, prior administrative medical findings, and Plaintiff's allegations pursuant to the appropriate legal standards." While she states this as the legal issue being raised, Maximovich' brief is broken into the following three sub-arguments: the ALJ's RFC determination lacks substantial evidence (*id.* at pp. 6-15), the ALJ failed to evaluate her subjective complaints pursuant to SSR 16-3p (*id.* at pp. 15-22) and failed to consider all medical evidence (*id.* at pp. 18).

### A. The ALJ's RFC determination is supported by substantial evidence and is appropriately tied to medical evidence.

In this section of her brief, Maximovich argues that the ALJ "assessed limitations based upon his own lay opinion and failed to identify the evidence within the record that supports the abilities reflected in the RFC finding." (ECF Doc. 9, p. 8). In response, the Commissioner argues that what Maximovich "tries to characterize as the ALJ 'relying on his own interpretation of the medical data,' . . . is better described as the ALJ fulfilling his legal duty to consider the record as a whole and weigh the evidence in assessing Plaintiff's RFC." (ECF Doc. 11, p. 7, quoting ECF Doc 9, p. 10).

Before proceeding to Step Four of the sequential analysis laid out in the regulations, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to work

despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011), citing 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."). Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p. Although these are not adversarial proceedings, *Biestek v. Berryhill*, 587 U.S. 97, 99 (2019), and the ALJ serves as a neutral factfinder, *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000), it is not incumbent on the ALJ to advance the claimant's case. *Richardson v. Perales*, 402 U.S. 389, 410 (1971). Therefore, "while the ALJ must ensure that every claimant receives a full and fair hearing, the ultimate burden of proving entitlement to benefits lies with the claimant." *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022), *cert. denied sub nom. Moats v. Kijakazi*, 143 S. Ct. 785 (2023) (internal citations and marks omitted).

In making his RFC finding, the ALJ stated as follows:

Turning to the medical evidence, as the claimant noted, between 2014-16, she underwent numerous procedures, including injections, blocks, radiofrequency ablation. However, in October 2019, only one month after the alleged onset date, records show that although she had throbbing back pain, the pain is helped by her medications. They also indicate that the pain is controlled and stable and that the claimant noted that she did not need to have anything done at that time. Consistent with her reports, outside of showing morbid obesity, her examination at that time revealed no significant abnormality, including an unremarkable musculoskeletal exam, normal range of motion/straight leg raise, and an unremarkable neurologic exam. Similarly, in October 2020, only two months prior to the date last insured, although a follow-up exam noted lumbar/sacroiliac tenderness and some diminished reflexes, she had a grossly normal gait, intact sensation, and 5/5 strength throughout.

The claimant was treated for fibromyalgia during the relevant period as well. She reported low back and upper back pain, more discomfort in her lower sacral spine and left him, and pain aggravated by activity or any motion of any length of time. There is not considerable evidence supporting fibromyalgia under SSR 12-2p; nonetheless, given the overall record and her subjective complaints, the undersigned found that fibromyalgia was a severe impairment.

14

Following the claimant's date last insured, she underwent a lumbar injection in December 2021. At a follow up appointment from this injection, in May 2022, (similar to her prior exams and despite reporting no relief from her injection), she reported only a 4/10 pain level, which was stable. Moreover, an exam was generally normal, with 5/5 strength, normal muscle tone, and intact sensation, despite back tenderness and diminished reflexes. Exhibit 5F, which was submitted post-hearing, contains emergency department records, but they are significantly after the date last insured and do not change the above analysis for the period at issue.

The claimant's Body Mass Index (BMI) was 43.48, which is considered obese. the undersigned has considered the exacerbating effect of the claimant's obesity on other impairments as required by SSR 19-2p. Obesity may also cause or contribute to mental impairments. The effects of obesity may be subtle, such as the loss of mental clarity and slowed reactions that may result from obesity-related sleep apnea. However, there is no evidence in the case record that the impact on musculoskeletal, respiratory, cardiovascular, or other body system functioning results in greater limitations than set forth in the residual functional capacity above, and the impact of obesity was considered in finding the claimant limited to a restricted range of light work activity.

(Tr. 23-24) (internal citations omitted).

Contrary to Maximovich's assertions, the ALJ clearly tied his RFC determination to medical evidence rather than relying on his own lay opinion. Maximovich cites to various medical records that she believes support her assessment that she should have a more restrictive RFC, however, "the regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC 'based on all of the relevant medical and other evidence of record.'" *Harris v. Comm'r of Soc. Sec.,* No. 1:13-cv-00260, 2014 WL 346287, at *11 (N.D. Ohio, Jan. 30, 2014). Maximovich further asserts that the state agency reviewing physicians offered no medical opinions, and thus the ALJ erred in crafting "an RFC finding without the benefit of a medical opinion." (ECF Doc. 9, p. 10). However, "[a]n ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x. 435, 439 (6th Cir. 2010). The ALJ is "not required to obtain a medical expert to interpret the medical

15

evidence related to [a claimant's] impairments." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x. 719, 727 (6th Cir. 2013). The record was not absent an opinion of the state agency reviewers; rather it was their opinion that there was insufficient medical evidence of record to evaluate Maximovich's alleged impairment, a valid conclusion for the agency reviewer to draw.

Accordingly, I find that the ALJ properly tied his RFC determination to the medical record and do not recommend remand on this basis.

**B.** **The ALJ did not err in his evaluation of Maximovich's subjective allegations.**

Next, Maximovich asserts that the ALJ "failed to evaluate [her] subjective allegations pursuant to SSR 16-3p." (ECF Doc 9, p. 15). In response, the Commissioner argues that Maximovich is "merely argu[ing] for a different weighing of th[e] evidence." (ECF Doc 11, p. 9).

Social Security Ruling 16-3p lists the factors relevant to the ALJ's determination of persuasiveness of a claimant's statements about "the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities." *Rogers v. Comm'r*, 486 F.3d 234, 247 (6th Cir. 2007). These factors include: the individual's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual has received for relief of pain or other symptoms; any measures other than treatment the individual uses or has used to relieve pain; and, "[a]ny other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms." SSR 16-3p, 2017 WL 5180304, at *7-8; see, e.g., *Morrison v. Comm'r*, No. 16-1360, 2017 WL 4278378, at *4 (6th Cir. Jan. 30, 2017). An ALJ need not expressly address all the factors listed in SSR 16-3p they but should sufficiently articulate the assessment of the

16

evidence to assure the reviewing court that the ALJ considered all relevant evidence. *Cross v. Comm'r*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005).

SSR 16-3p also instructs an ALJ how to consider a claimant's statements about intensity, persistence, or functional limiting effects of their symptoms in relation to treatment sought for those symptoms.

> [I]f the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints.

SSR 16-3p at *9. "Attempts to obtain treatment may show that symptoms are intense and persistent; conversely, a lack of such efforts may show that an individual's symptoms are not intense or persistent." *Jill L. v. Comm'r of Soc. Sec.*, 2023 WL 4757601, at *7 (S.D. Ohio 2023), citing SSR 16-3p at *9. However, the ALJ "will not find an individual's symptoms inconsistent . . . on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." SSR 16-3p at *9. An ALJ must consider these reasons "before drawing an adverse inference from the claimant's lack of medical treatment." *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 (6th Cir. 2016).

Here, after discussing the medical evidence, the ALJ went on to address Maximovich's subjective statements regarding intensity, persistence, and the limiting effects of her symptoms. The ALJ found these statements inconsistent with the medical record:

> Considering the claimant's continuing activities, limited treatment seeking and conservative care, as well as reports to medical personnel, and objective examination findings, the claimant has the ability to perform a reduced range of light work, as found in the residual functional capacity. . . . Given her fibromyalgia,

17

back issues, and obesity, the undersigned included postural and environmental
limitations, including no crawling or climbing of ladders, ropes, or scaffolds, as
well as no exposure to unprotected heights or moving mechanical parts and
commercial driving.

(Tr. 24). In her brief, Maximovich quotes this paragraph and attributes it to the ALJ

"inappropriately play[ing] doctor." (ECF Doc. 9, p. 10). The ALJ's finding here regarding

Maximovich's subjective statements about her symptoms is a determination specifically reserved

for the ALJ, and entirely consistent with an ALJ's role. Accordingly, Maximovich's concern is

unwarranted.

She further asserts error where the ALJ cited to limited treatment seeking and

conservative care to support his decision. (ECF Doc. 9, p. 13). The medical record demonstrates

that during the relevant time period, Maximovich attended follow up appointments for pain

management and fibromyalgia. (Tr. 266-67, 307). Aside from treatment for deep vein thrombosis

and blood clots (Tr. 394, 400, 410), the only treatment record included is the December 17, 2021

bilateral sacroiliac injection – and I note each of these occurred after the DLI. (Tr. 365).

Therefore, I cannot say that the ALJ erred when he found that the record demonstrated "limited

treatment seeking and conservative care." (Tr. 24). In support of her assertion to the contrary,

Maximovich argues that she "had extensive treatment prior to the alleged onset date . . . ." (ECF

Doc. 9, p. 13).

As Maximovich acknowledges, these treatments are several years before the alleged

onset date; with the exception of one unrelated medical record indicating an injection in 2019.

(Tr. 385). Notwithstanding the fact they occurred before Maximovich's alleged onset date, the

ALJ noted these injections in his decision. "Turning to the medical evidence, as the claimant

noted, between 2014-16, she underwent numerous procedures, including injections, blocks,

radiofrequency ablation." Tr. 23. Despite occurring years prior to the alleged onset date, the ALJ

considered the treatment rendered Maximovich is now simply asking this Court to re-weigh the evidence – an invitation it cannot and will not accept.

### C.      A Sentence Six Remand is Not Required.

Finally, Maximovich argues that because "the record now contains additional objective evidence that was never evaluated by the ALJ nor the Appeals Council . . . [r]emand is required for consideration of this evidence" pursuant to sentence six of 42 U.S.C. § 405(g). (ECF Doc 9, p. 18). Conversely, the Commissioner argues that Maximovich does not meet the sentence six criteria. (ECF Doc 11, pp. 11-12).

A court may remand a case for the Commissioner to consider newly discovered evidence pursuant to sentence six of 42 U.S.C. § 405(g). To obtain such a remand, the claimant must show that: (1) the evidence is new; (2) the evidence is material; and (3) good cause excuses the claimant's failure to incorporate the evidence into a prior administrative proceeding. 42 U.S.C. § 405(g); *Casey v. Sec'y of Health & Hum. Serv.*, 987 F.2d 1230, 1233 (6th Cir. 1993). "New evidence" is evidence that did not exist or was not available to the claimant at the time of the administrative proceeding. *Finkelstein v. Sullivan*, 496 U.S. 617, 626 (1990). To be material, the evidence must be: (1) chronologically relevant, *i.e.* reflect upon the claimant's condition during the relevant period; and (2) probative, *i.e.*, have a reasonable probability that it would change the administrative result. *See Casey*, 987 F.2d at 1233 (holding that a claimant's new evidence was not material because it did not show a "marked departure from previous examinations" and it "pertain[ed] to a time outside the scope of our inquiry"); *accord Winslow v. Comm'r of Soc. Sec.*, 556 F. App'x 418, 422 (6th Cir. 2014). The Sixth Circuit takes a "harder line" approach to good cause – a claimant cannot simply point to the fact that the evidence was not created until after the ALJ hearing but must establish good cause for why he did not cause the evidence to be created

and produced until after the administrative proceeding. *See Perkins v. Apfel*, 14 F. App'x 593, 598-99 (6th Cir. 2001).

The records at issue are imaging results from 2013, 2014, and 2015. (Tr. 61-66). Because it is dispositive of this issue, I reiterate that to be material, the evidence must be: (1) chronologically relevant, i.e. reflect upon the claimant's condition during the relevant period; and (2) probative, i.e., have a reasonable probability that it would change the administrative result. These imaging results are neither.

First, they are not chronologically relevant. Maximovich's alleged onset date was August 22, 2019, and she has not demonstrated how imaging from four to six years prior to that date is chronologically relevant. Further question is raised when noting there are no other records indicating continued care or treatment for related conditions within the interim time period. Second, she has not demonstrated how these records are probative. As explained above, these records indicate mild degenerative changes, minimal/minor osteoarthritis, and degenerative disc disease. (Tr. 61, 63, 64, 66). The ALJ found degenerative disc disease to be a severe impairment, meaning that record does not indicate any likely change. (Tr. 21). Further, the other impairments would not negate the ALJ's finding that there was minimal treatment seeking and conservative care as he had the benefit of reviewing her medical records after the imaging occurred. Therefore, because the records are not material or probative I decline to recommend remand on this basis.

## VII.    Recommendation

Because the Administrative Law Judge applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Maximovich's application for disability insurance benefits be affirmed.

Dated: March 18, 2025

Reuben J. Sheperd
United States Magistrate Judge

---

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, \*2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).